KREIDER, P. J.,
— Relator, William C. Sennett, Attorney General of the Commonwealth of Pennsylvania, filed a complaint in mandamus against defendant, Grace M. Sloan, State Treasurer, and at the same time presented a motion for summary judgment in his favor. Thereafter a stipulation and an amended stipulation of facts and waiver of jury trial were filed and a hearing held by the court *285 on the motion. Various exhibits, consisting chiefly of letters exchanged between the State Treasurer and the Attorney General were attached to the stipulations but no other evidence was offered. Subsequently, argument was heard before the court en banc on the motion for summary judgment and the application for a writ of mandamus. These matters are now before us for disposition.
The Attorney General’s position is that his right to have summary judgment and a writ of mandamus is clear and his counsel general argues that the controversy between the Department of Justice of which the Attorney General is the appointed head, and the State Treasurer was decided in the relator’s favor by Governor Shafer under section 1502 of The Fiscal Code of April 9, 1929, P. L. 343, 72 PS §1502, and, therefore, the State Treasurer is bound to follow the Attorney General’s opinion in support of the Governor’s decision under section 512 of The Administrative Code, 71 PS §192.
Relator’s motion for summary judgment avers that:
“3. The Plaintiff has a clear right to summary judgment by reason of the following facts:
“A. The Defendant has refused to perform her duty as defined by Section 1502 of The Fiscal Code by refusing to make payment of $42,877.51 to Keisling Associates, Inc. in accordance with warrants No. 72841, No. 72842 and No. 72843 issued by the Department of the Auditor General in compliance with the directions of the Honorable Raymond P. Shafer, Governor of Pennsylvania, after a final determination by the Governor wherein he agreed with the Auditor General that said payment should be made.
“B. It is the duty of the Defendant to follow the advice of the Attorney General in all matters involv *286 ing her official acts and the official conduct of her office and specifically that it is her statutory duty to make full payment to Keisling Associates, Inc., in accordance with the aforementioned warrants.”
Section 1502 of The Fiscal Code of April 9, 1929, P. L. 343, 72 PS § 1502, provides, in relevant part:
“All requisitions shall be audited by the Department of the Auditor General, and, if they appear to be lawful and correct, the department shall approve them and transmit them to the Treasury Department for examination and approval . . .
“If the Department of the Auditor General, upon reconsideration, shall be unable to agree with the views of the Treasury Department, it shall lay before the Governor the requisition, together with all the papers and correspondence attached or appertaining thereto, and the Governor shall decide the issue raised between the two departments . . .”
The Attorney General contends in his brief that section 1502 of The Fiscal Code has made the Governor the final arbiter in such a dispute; that its purpose is to resolve an impasse existing between two executive officers of the State government by conferring the authority to make the final determination upon the Chief Executive; that if the Governor should determine that the requisition ought to be approved in whole or in part, the Governor must direct the Auditor General to issue a warrant to effect payment; that The Fiscal Code makes the Governor’s determination final and binding on all fiscal officers and that, in fact, the legislature has imposed a mandatory duty upon the State Treasurer to make payment in accordance with a warrant issued by the Auditor General. The relevant statutory section reads, in part, as follows:
*287 “On and after the first day of June one thousand nine hundred and nine, every warrant drawn by the Auditor General upon the State Treasurer shall be transmitted by the Auditor General to the State Treasurer, who shall, thereupon, make payment to the person, persons, firm, or corporation named as payee or payees in the warrant; . . Act of April 29, 1909, P. L. 281, sec. 1, 72 PS §4545.
The State Treasurer in her answer to the motion for summary judgment and the complaint in mandamus avers that the Attorney General is seeking to use mandamus to enforce payment of a private contractor’s claims for services allegedly rendered under a contract awarded by the Department of Justice December 1, 1967, to Keisling Associates, Inc. as “exclusive public information, public relations and advertising agent in the Department’s field of Consumer Protection;”[1] that the right sought to be enforced is not a public but a private right and that there is an adequate remedy at law for enforcement of that right by proceeding before the Board of Arbitration of Claims which the legislature created by passage of the Act of May 20, 1937, P. L. 728, as amended, 72 PS §4651-1, or before the so-called Board of Claims consisting of the Auditor General and the State Treasurer, which functions pursuant to the Act of March 30, 1811, P. L. 145, 5 Sm. L. 288, and The Fiscal Code of April 9, 1929, P. L. 343, 72 PS §1003; and that an appeal lies to the courts from the decision of each of these tribunals.
The State Treasurer further avers in her answer that the instant case presents serious constitutional issues in that if section 512 of The Administrative Code,[2] 71 PS §192, which provides that any depart *288 ment having requested and received legal advice from the Department of Justice, shall follow the same, and section 1502 of The Fiscal Code, supra, 72 PS §1502, were interpreted as requested by the Attorney General, those provisions are unconstitutional because they would be in violation of the basic constitutional principle of separation of powers; that neither the Attorney General, who is a member of the Executive Department, nor the Governor, who is the head of that department, can constitutionally be given the power to discharge the judicial function of deciding legal controversies between the fiscal officers and other departments of the government involving the validity of public contracts and money claims made thereunder by private persons.
It is also contended by the State Treasurer that if the writ of mandamus issues, it will prevent examination of the validity of the Keisling contract, with the result that the Attorney General and the Governor will be permitted, in effect, to grant a waiver of the Commonwealth’s sovereign immunity from suit to an extent never intended or granted by the legislature and to nullify defenses to a substantial claim for money which have been asserted in good faith by one of the Commonwealth’s duly elected fiscal officers.
QUESTIONS INVOLVED
I. After the Governor has rendered his decision under section 1502 of The Fiscal Code in a dispute between the State Treasurer and the Department of Justice arising out of a contract awarded by the latter, may the State Treasurer defend against an action in mandamus and question the Governor’s decision, the validity of the contract, the procedure adopted by the Department of Justice to secure its enforcement and the constitutionality of certain sections of The Fiscal and Administrative Codes?
*289 II. Has the relator-Attorney General shown that he has a clear right to summary judgment and the extraordinary writ of mandamus under the particular facts of this case?
III. Has the relator-Attorney General shown that he has a clear right to a writ of mandamus to compel the State Treasurer to pay a private party’s claim for $42,877.51 which the State Treasurer had disapproved, before there has been any examination and approval by some administrative or judicial tribunal and where the private claimant has an adequate remedy at law provided by the legislature before the Board of Arbitration of Claims (72 PS §4651-1, et seq.) and the Board of Claims: 72 PS §1003?
IV. Has the relator-Attorney General shown that the Governor and he, being signatories to the contract under which the claim arose, have a clear right to discharge the function of deciding legal controversies over the validity of private parties’ claims under public contracts, despite article I, sec. 11, of the Constitution of Pennsylvania, which provides that “Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.”
Before discussing these questions, we shall consider the function of
THE BOARD OF ARBITRATION OF CLAIMS
The State Treasurer contends that basically this case involves the claim of a private contractor which should be brought before the Board of Arbitration of Claims in the same manner as other claims against the Commonwealth are litigated. Section 4 of the act creating the board provides that:
“The Board of Arbitration shall have jurisdiction to hear and determine all claims against the Common *290 wealth arising from contracts hereafter entered into with the Commonwealth, where the amount in controversy amounts to $300.00 or more”:[3] Act of May 20, 1937, P. L. 728, sec. 4; September 29, 1961, P. L. 1738, sec. 4, 72 PS §4651-4.
In Foley Bros., Inc. v. Commonwealth, 400 Pa. 584 (1960), our Supreme Court referred to the act establishing the Board of Arbitration of Claims as follows:
“. . . the Act of 1937 is a self-contained Act created eocpressly for the disposition of claims against the Commonwealth, which can be sued only when and how it permits . . and, at page 593:
“. . . we consider the Board as a judicial tribunal: Kaufman Construction Co. v. Holcomb, supra (357 Pa. 514); Merchants’ Warehouse Co. v. Gelder, 349 Pa. 1 (1944), 36 A.2d 444; Philadelphia Housing Authority v. Turner Construction Co., 343 Pa. 512 (1942), 23 A.2d 426.”
In the oft-quoted case of Kaufman Construction Co. v. Holcomb et al., supra (1947), the Supreme Court, speaking through Mr. Justice (afterwards Chief Justice) Horace Stern, stated, page 516:
“Subject to the limitations arising from the federal nature of our government and the provisions of the federal Constitution the Commonwealth of Pennsylvania is a sovereign State, and, as such, it cannot be sued except with its own consent: Merchants’ Warehouse Co. v. Gelder, 349 Pa. 1, 7, 36 A.2d 444, 447, 448. That consent is conditionally provided by Article I, section 11 of the State Constitution, which says that ‘Suits may be brought against the Commonwealth in such manner, is such courts and in such cases as the Legislature may by law direct.’ By the Act of March 30, 1811, P. L. 145, 5 Sm. L. 228, the Legis *291 lature provided for the adjustment and settlement of claims against the Commonwealth by the Auditor General and the State Treasurer with a right of appeal to the Court of Common Pleas ‘of the county in which the seat of government shall then be.’ The Fiscal Code of 1929, P. L. 343, section 1003, continued that procedure; section 1103 granted the claimant a right to have the action of those officials reviewed by the Board of Finance and Revenue and section 1104 gave a right of appeal to the Court of Common Pleas of Dauphin County and thence to the appellate courts of the State.
“By the Act of May 20, 1937, P. L. 728, the Legislature established a new tribunal, the so-called Board of Arbitration of Claims, consisting of three members appointed by the Governor, with jurisdiction to hear and determine claims against the Commonwealth arising from contracts entered into by it. . .” and, at page 519:
“. . . Moreover, the Board of Arbitration, though referred to in the amendatory Act of June 26, 1939, P. L. 1081, section 1, as a ‘departmental administrative board in the Department of the Auditor General,’ is in reality itself a judicial body.”
The Board of Arbitration of Claims Act was amended in 1961 to permit foil appellate review: Act of September 29, 1961, P. L. 1738, secs. 5(b) and (c), 72 PS §4651-8.
In Gann-Dawson, Inc. v. Commonwealth, 86 Dauph. 194 (1966), 41 D. & C. 2d 355, it was held that the Board of Arbitration of Claims has jurisdiction to entertain and make an award on a claim arising out of a contract to which the Commonwealth was a party where the Department of Revenue, which had entered into a contract with the plaintiff, a public relations firm, on behalf of the Commonwealth, *292 admitted liability but the Auditor General, not a party to the contract nor a named party in the proceedings before the board, refused to authorize payment for some unspecified reason.
In that case, this court, speaking through Judge James S. Bowman, stated at pages 196-97:
“So long as appellant remains unpaid by the Commonwealth upon a claim arising out of a contract to which the Commonwealth is a party, we believe the plain meaning of the statute confers jurisdiction upon the board over the subject matter of the controversy. It was not the Department of Revenue that entered into the contract with appellant but rather the Commonwealth of Pennsylvania acting through that department. That the Department of Revenue approved appellant’s claim and performed its responsibilities towards ultimate payment is of little moment to appellant who remains unpaid and who must look to the sovereign State, not a particular department, for payment. And the limited channels through which one having a claim against the State must guide his course or founder upon the shoals of sovereign immunity from suit suggest that the legislature, in impairing this immunity, intended broad jurisdiction in the board over claims against the Commonwealth founded in contracts to which the State itself is a party.
“We recognize, of course, that the vast majority of claims presented to and entertained by the board involve disputes between the agency of the Commonwealth which executed a contract on its behalf and the other party to the contract. This fact alone, however, is no reason to restrict the otherwise plain meaning of the legislature affording jurisdiction to the board to hear all claims against the Commonwealth. Whether *293 the merits of the claim will involve one or more departments or agencies of the State in its ultimate determination is not relevant to determining the matter of jurisdiction over the subject matter. . .”
The court remanded that case to the board for a hearing on the merits and to afford the Auditor General an opportunity to present her objections to the claim which was being supported by the Executive Department, and to make the Auditor General a party, if necessary, for that purpose.
Another case in point is Road Machinery, Inc. v. Commonwealth, 88 Dauph. 1 (1967). There, Judge William W. Lipsitt stated, at page 5:
“Directly concerned here is the extent of the authority of the Board of Arbitration of Claims. The Board was created by the Act of May 20, 1937, P. L. 728, 72 PS 4651-1, et seq. The Commonwealth of Pennsylvania is a sovereign state, and as such it cannot be sued except with its consent. The creation of the Board of Arbitration of Claims provided a comprehensive plan to arbitrate claims against the Commonwealth arising from contracts entered into by the Commonwealth. . .” (Italics supplied.)
In Balazick et al. v. Harral et al., 88 Dauph. 113 (1967), a suit in equity by a contractor to enjoin the Commonwealth from paying damages to a third party in accordance with the terms of the contract for the improvement of a highway, on the ground that the contractor was not responsible for the damages, was dismissed for lack of jurisdiction, since plaintiff had a complete and adequate remedy at law by filing a claim before the Board of Arbitration of Claims under the Act of May 20, 1937, P. L. 728, as amended. It was further held that equity has no jurisdiction to inquire into a controversy where to do so would *294 obviate a statutory procedure provided by the legislature for its resolution. In his opinion in that case, Judge Shelley cited Collegeville Borough v. Philadelphia Suburban Water Co., 377 Pa. 636 (1954), wherein the Supreme Court said, at page 645:
“When a statute provides a remedy by which a right may be enforced, no other remedy than that afforded by the statute can be used.”
In view of these and other authorities, it is somewhat difficult to understand why Keisling Associates, Inc., did not present its original $288 claim to the Board of Arbitration of Claims, after it reached the minimum statutory amount of $300, in view of the persistent questioning of the contract by Mrs. Sloan who was then the Auditor General of Pennsylvania. Her first inquiry seeking additional information was stated in a letter dated May 9, 1968, to the Attorney General three days after she received voucher transmittal no. 267 requesting payment, inter alia, of an item of $288, allegedly due Keisling for services performed during the month of March 1968, pursuant to a contract entered into between the Department of Justice and William Keisling dated December 1, 1967.
On May 23, 1968, the Attorney General responded to defendant’s letter of May 9, 1968 (exhibits “A” and “B” — Stipulation of Facts). The next month, by letter dated June 19, 1968, defendant, as Auditor General again wrote to the Attorney General requesting further justification for the contract and the proposed payment to Keisling (exhibit “C” — Stipulation of Facts).
The Department of Justice never responded to defendant’s letter dated June 19, 1968 (Stipulation of Facts, par. 7) and further communication between *295 these two departments in regard to this matter temporarily came to an end.
Meanwhile, Keisling presumably continued to furnish services for the Department of Justice under the contract and apparently was content to do so without receiving any monetary compensation or making any claim therefor until about 17 months had elapsed and Mrs. Sloan’s term of office as Auditor General had expired on May 5, 1969. On that date, she became the State Treasurer.
Six months later, in November 1969, Keisling’s original claim for $288 was again submitted by the Department of Justice to the newly elected Auditor General, the Hon. Robert P. Casey, together with additional claims in excess of $42,000 for services alleged to have been performed by Keisling during the last nine months of 1968 and the first five months of 1969, viz., during the period from April 1968 through May 1969. That total claim was for $42,-589.51 as set forth more fully in paragraph 8 of the Stipulation of Facts.[4]
After Keisling’s total claim was approved by *296 Auditor General Casey, it was submitted by the latter as required by section 1502 of The Fiscal Code to the State Treasurer for her approval. When she rejected it, the present Auditor General, being unable to agree with her views, certified the matter to Governor Shafer who rendered his decision on December 9,1969, sustaining the claim and directing the Auditor General to resubmit the warrants to the State Treasurer for payment. The Auditor General complied but defendant again declined to honor the warrants, stating her reasons and raising constitutional and other questions in a letter to the Attorney General dated January 6, 1970 (Stipulation of Facts, exhibit “I”) after he had notified her by letter dated December 23, 1969 (Stipulation of Facts, exhibit “G”) that:
“. . . the Fiscal Code unequivocally and unqualifiedly confirms the finality of the Governor’s decision requiring the payment of the requisitions under the circumstances herein involved. Under the law, neither the State Treasurer nor the Auditor General has any further discretion in this matter and they are bound to comply with the Governor’s decision.”
Thereafter this action is mandamus was instituted.
We turn now to the legal questions involved in the case before us. With respect to whether the State *297 Treasurer has the right to defend in this action of mandamus after the Governor rendered his decision, the Attorney General contends that she has no such right. His position is that at that point the Governor’s decision is final and that the State Treasurer has no further discretion in the matter. He further contends that defendant is required to obey the opinion of the Attorney General in support of that decision and cites as authority section 512 of The Administrative Code of April 9, 1929, 71 PS §192, which provides, in pertinent part, as follows:
“Whenever any department, board, commission, or officer of the State Government, shall require legal advice concerning its conduct or operation, or when any legal difficulty or dispute arises, or litigation is commenced or to be commenced in which any department, board, commission, or officer, is concerned, . . . it shall be the duty of such department, board, commission, or officer, to refer the same to the Department of Justice.
“It shall be the duty of any department, board, commission, or officer, having requested and received legal advice from the Department of Justice, regarding the official duty of such department, board, commission, or officer, to follow the same, . . .”
Here, it may be appropriate to consider—
THE OFFICE AND POWERS OF THE STATE TREASURER
Article IV, sec. 1, of the Constitution of the Commonwealth of Pennsylvania provides:
“The Executive Department of this Commonwealth shall consist of a Governor, Lieutenant Governor, Attorney General, Auditor General, State Treasurer, and Superintendent of Public Instruction and such other officers as the General Assembly may from time to time prescribe.”
*298 In commenting upon the power and duties of the State Treasurer and Auditor General, this court in Commonwealth ex rel. Sennett, v. Minehart, 88 Dauph. 279 (1967), 44 D. & C. 2d 657, quoted from Com. ex rel. Bell, v. Powell, 249 Pa. 144 (1915), wherein the Supreme Court of Pennsylvania said, at page 154:
“. . . while these officers are named in the Constitution, yet their duties are not therein defined. That was left to the legislature. That body did define the duties of these officers, prior to the present Constitution, in the Act of March 30, 1811, 5 Sm. L. 228, and it is suggested that in adopting the present Constitution the continuance of those duties was contemplated. It must be admitted, however, that as the legislature originally prescribed those duties, it has power to alter them, . . .”
Section 707 of The Administrative Code of April 9, 1929, P. L. 177, art. VII, 71 PS §247, provides:
“The State Treasurer shall exercise such powers and perform such duties as may now or hereafter be vested in and imposed upon him by the Constitution and laws of this Commonwealth.”
Section 1101 of The Administrative Code, art. XI, 71 PS §321, provides:
“Subject to any inconsistent provisions in this act contained, the Treasury Department shall exercise its powers and perform its duties as provided in The Fiscal Code and other applicable laws.”
It appears, therefore, that the duties, responsibilities and powers of the State Treasurer flow from legislative enactments and such inherent constitutional powers as may appertain to that high office.
The right of the State Treasurer to raise a constitutional question as a defense to her refusal to make payments on warrants drawn on her pursuant to an *299 Act of Assembly is an intriguing subject and remained unsettled in the gray areas of the law until the Supreme Court finally came to grips with it in the celebrated case of Com. ex rel. the Attorney General v. Mathues, 210 Pa. 372 (1904). There, the State Treasurer had refused to honor warrants drawn on him by the Auditor General for the payment of increased salaries for almost the entire judiciary of the State, on the ground that the Act of April 14, 1903, P. L. 175, could not constitutionally be construed to entitle judges in commission at the date of the approval thereof to the salaries thereby fixed. The Constitution, however, also contained another section which required that the salary of the judges should be “adequate.”
The Attorney General on behalf of the Commonwealth and for the use of 14 named judges and all others similarly interested, brought an action in mandamus to enforce payment after he had advised the State Treasurer that the Act of 1903 was constitutional and binding upon him, and that it was his duty to make payments on warrants drawn upon him, but he still refused to pay.
The Attorney General in that case, as stated by the court, “assumed the attitude that the state treasurer was a mere ministerial officer, bound to blindly obey the mandates of the legislature as interpreted by the governor and his law officer.” Moreover, there, as here, it was contended that there would be an obstruction to the cause of government if every State officer can refuse to follow the Attorney General’s advice.
These contentions were overruled by the lower court and by the Supreme Court on appeal which, though sustaining the act, held that the State Treasurer, being a high constitutional officer of the Com *300 monwealth, had the right to raise a constitutional question as a defense to his refusal to honor the warrants.
The opinion of the lower court was written by Judge Robert von Moschzisker, a distinguished legal scholar and afterwards Chief Justice of Pennsylvania.[5] It deals so fully and effectively with one of the questions before us that we feel justified in setting it forth at length.
In discussing the office and powers of the State Treasurer Judge von Moschzisker stated, at pages 380-83:
“However, as the main question raised and argued on the motion of the attorney general to strike out was whether or not the state treasurer, being a ministerial officer, had a right in his answer to raise the constitutional question as a defense to his refusal to honor the warrants drawn on him under the act of 1903, and as the attorney general, representing the state, contended for his position so stoutly, and assumed the attitude that the state treasurer was a mere ministerial officer, bound to blindly obey the mandates of the legislature as interpreted by the governor and his law officer, on the theory that all executive officers are under the immediate supervision and control of the governor, and that there should be a refusal to recognize in any manner the *301 right of the respondent as an officer to raise the question contained in the averments of his answer, and as the attorney general further contended that the issue involved was vital to the cause of efficient government, and the determination thereof would affect the interests of the commonwealth to an extent not limited to the present case, we, therefore, deem it our duty to examine the question with more than ordinary care.
“As to the right of the state treasurer to defend against an application for the writ of mandamus on the ground of the alleged unconstitutionality of an act of the legislature, the Pennsylvania cases are unsatisfactory. Com. v. James 135 Pa. 480 (1890), is a recent case holding that such a plea is not a good defense where the officer refusing has no discretion. Here a mandamus was granted against a clerk of the court of quarter sessions, who had declined to file and record the resolutions of the boards of school directors, in a city of the third class, which had accepted the provisions of the Act of May 23, 1889, P. L. 274. The court in a per curiam opinion said: The act referred to requires him to receive and record these papers; his duties were purely ministerial, and the court below properly awarded the peremptory mandamus. It is but just to say that his act in refusing does not appear to have been one of insubordination, but was intended to test the constitutionality of the said act of 1889. We are of opinion that the constitutional question cannot be raised in this way. We really have no case before us, beyond the mere refusal of the clerk to file the papers.’
“But does this case correspond to the present case of state treasurer, a high constitutional officer of the commonwealth, obligated to care for and protect the funds of the people, and who, furthermore, has the most *302 vital pecuniary interest under his bond? We think not.
“There are a number of old cases and two comparatively late Pennsylvania cases, taking it for granted that the state treasurer has this right, but not passing directly upon the point. Com. v. Butler, 99 Pa. 535 (1882), and Com. v. Gregg, 161 Pa. 582 (1894), were both cases where the state treasurer had refused to honor requisitions, because he did not consider the acts valid. In both cases the court granted a peremptory mandamus, and in neither case did the court criticise the action of the officials in contesting the validity of the act. Com. ex rel. v. Lemon, 2 Chester Co. Rep. 167, does not bear in any way upon this question. The court simply decided that the treasurer should pay the money he had on hand — not that the court would not go into the constitutionality of the act. The famous case of Com. v. Mann, 5 W. & S. 403 (1843), at pages 421 and 422 of the report, throws some light upon the subject.
“The Act of March 30, 1811, sec. 8, 5 Sm. L. 228, provides: The State Treasurer shall pay all grants, salaries, annuities, gratuities and pensions established by law, and make all other payments which are or shall be so fixed by law.’ Does this not call for some exercise of discretion upon his part? Is he not more than the court clerk who assumes no obligations? The Pennsylvania decisions above referred to point toward but do not establish this distinction. If ‘established by law’ means merely founded upon a legislative enactment, then, the state treasurer is a clerk, with no discretion whatsoever; but if this clause means ‘established by a (valid) law,’ then a different aspect is put upon the matter. The question we are now considering as to the light of an administrative officer, such as the state treasurer, to defend against a man- *303 damns proceeding such as the present by questioning the constitutionality of an act of the legislature, seems to be a hitherto unsettled point in Pennsylvania, and it is necessary to make a survey of the law in other jurisdictions before arriving at a satisfactory conclusion.
“In the other jurisdictions we find anything but harmony on the subject. The federal cases uniformly hold that an officer, though he be no more than a ministerial officer, has no right to obey an invalid law; that his duty to the state and national constitutions is greater than his respect for the acts of the legislature; that such an act is no law at all, neither compelling him to obey nor protecting him is he has obeyed it. The opposing cases urge the obstruction to the course of government in the state if every officer can refuse to act. Some of the states, while admitting the right of certain officers to contest the validity of an act, deny it to the more humble officers. In all states, and in the federal courts as well, it is conceded to be a step taken at the officer’s peril and which he should not take lightly: 19 Am. & Eng. Ency. of Law. (2d ed.), 764; 23 Am. & Eng. Ency. of Law (2d ed.), 369.”
Judge von Moschzisker in the Mathues case further states, at page 385:
“It is thus conclusively shown that the United States courts regard an unconstitutional act of the state as no act, and regard the officer obeying such statute as in no wise protected. It would, therefore, seem a very harsh doctrine that would deny the state treasurer the right to obtain judicial instruction by refusing to obey that which he may honestly believe to be an unconstitutional law, in view of the fact that the federal courts hold him a wrongdoer, hable to any party injured, if he should act thereunder.”
*304 and, after reviewing the law in various other States, said, at page 390:
“. . . We can hardly subscribe to the doctrine which the attorney general seeks to support by the case of State v. Buchanan, 24 W. Va. 362, to the effect that the mere fact that the governor, as the constitutional head of the state government, has signed a bill deprives the state treasurer of any and all right to question its constitutionality.
“These cases will give a general view of the law in this country. It is not harmonious, but the weight of authority appears to be in favor of the cases which hold to the right, and, in some instances, the duty, of certain administrative officers to refuse to act under what they honestly believe to be an unconstitutional act. ... It can be seen that the courts of other jurisdictions have drawn a distinction between strictly ministerial officers, such as inspectors of elections and clerks of courts, and higher officers, such as state treasurers and state auditors, who, according to the cases, seem called upon or permitted to exercise a certain amount of judicial interpretation.
“Although we do not decide that all ministerial officers of the state government have a right to refuse to act under a law because they conceive it to be unconstitutional, and thus constitute themselves tribunals to pass upon the validity of acts of the legislature generally, we do hold in this particular case that the state treasurer, being a high constitutional officer of the commonwealth, intrusted with the funds of the state, under the law, has the right to raise by his pleadings, the question of the constitutionality of the act of April 14, 1903, fixing the salaries of the judges of the commonwealth. For the reasons given, the motion to strike out must be overruled and the answer of the state treasurer stand as stated.”
*305 In a concurring opinion in the Mathues case President Judge Bell, of Blair County stated at pages 412-13:
“The first question argued before us was the right of the state treasurer to object to paying warrants drawn by the proper officer, namely, the auditor general, under the provisions of an act of assembly duly passed, out of moneys specifically appropriated for that purpose. The attorney general contended that the state treasurer was in such a case a mere ministerial officer, bound to pay out the money, not competent to question the constitutionality of the will of the legislature, evidenced by a statute regularly enacted. Mr. Carson, in effect, sought to liken the state treasurer to the disbursing officer of a corporation. If the board of directors had duly authorized the expenditure, and the warrant was properly drawn, most certainly such disbursing officer would not be allowed to refuse payment because he doubted whether the directors had acted wisely in making the expenditure. The argument of the attorney general is not without some seeming plausibility, but its vice consists in losing sight of the fact that the state treasurer is a high official, sworn to protect the constitution, and an unconstitutional statute is a nullity, gives no authority, extends no protection, and is binding on no one,
“It may be that the doctrine contended for by Mr. Carson is applicable to the case of an inferior officer, whose duties are entirely ministerial, but the weight of authority, as shown by the review of the adjudicated cases contained in the opinion of Judge von Moschzisker, is that it is inapplicable to the case of a state treasurer.”
And, at page 415:
“As shown by the authorities cited by my colleague, it is a rule of judicial construction, that when there is *306 a conflict between a general intent and a specific enactment, the general intent must yield rather than the specific enactment. In the present instance the general intent, as shown by section 13, article III, is that no law shall increase the salary of a public officer after his appointment. The specific intent, for reasons which we have stated, is that in the peculiar cases of judges, their salaries may be increased.”
In speaking for the Supreme Court in the Mathues case, Mr. Justice Thompson stated, at page 425:
“It cannot be successfully contended that the judiciary under the article is entitled to a right and that by the construction of another part of the constitution such right is destroyed and made nugatory. A construction leading to such result would lack the essential elements that should prevail in constitutional construction and would be violative of the rule that a constitution is ‘to be interpreted to carry out the great principles of government and not to defeat them.’ ”
In the case at bar, we believe the State Treasurer, being a high constitutional officer of the Commonwealth, had the right to raise, inter aha, the question whether the Governor was empowered under the circumstances “to decide the issue” under section 1502 of The Fiscal Code and ignore the Board of Arbitration of Claims which, as above stated, the legislature created “to hear and determine all claims against the Commonwealth arising from contracts hereafter entered into with the Commonwealth. . .”
If the Governor has such power, as the Attorney General contends, is not the doctrine of separation of powers of government distorted and the intent of the legislature thwarted? The basis of the Governor’s “decision” is contained in a single sentence in his letter of November 9, 1969, to Auditor General Casey, viz.:
*307 “I have thoroughly reviewed the entire record in this matter and concur in your determination that the said voucher transmittals are lawful and correct and that the same should be approved and paid in full.” (Stipulation of Facts, exhibit “E”)
It will be noted that section 1502, 72 PS §1502, of The Fiscal Code deals generally with “all requisitions” and hardly can be interpreted to mean “all claims against the Commonwealth arising from contracts entered into with the Commonwealth” of which the Board of Arbitration of Claims has jurisdiction: 72 PS §4651-4. This conclusion is supported by The Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 63,46 PS §563, which provides:
“Whenever a general provision in a law shall be in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions be irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the Legislature that such general provision shall prevail.”
Here, the legislature has waived the Commonwealth’s immunity from suit only to the extent of permitting proceedings before the Board of Arbitration of Claims and the Board of Claims. We think it is unrealistic to assume the legislature intended that claims such as the one in question should be subject to section 1502 of The Fiscal Code.
It must be borne in mind that the Board of Arbitration of Claims is, in reality, a judicial tribunal whose proceedings closely resemble those of a common pleas court sitting without a jury. The Act of Assembly, *308 as amended, under which the board operates provides in section 8:
“(a) All hearings before the board shall be public and shall be governed by all of the rules of Pennsylvania Civil Procedure not inconsistent with this act. ... It shall file a written opinion setting forth the reasons for its action. . .
“(b) Within thirty (30) days after dismissing the claim or making an award, any party aggrieved thereby, including the Commonwealth, shall have a right of appeal therefrom. .
Having provided such “a comprehensive plan” for the disposition of contract claims against the Commonwealth, we do not believe the legislature intended to thrust upon the Governor, who is constantly besieged by multitudinous and perplexing problems of the State government, the additional burden of acting as the sole and final judge in cases where the Department of the Auditor General is unable to agree with the views of the Treasury Department in claims against the Commonwealth arising from contracts entered into by the Commonwealth.
We desire to make it clear that nothing in this opinion is intended to reflect in the slightest degree upon the parties involved. The devotion of Attorney General Sennett, State Treasurer Sloan, Governor Shafer and Auditor General Casey to the public welfare is well known and deservedly recognized by all informed citizens.
Moreover, the establishing of the Bureau of Consumer Protection in the Department of Justice by Executive Order of Governor Scranton and Governor Shafer, promulgated in 1966 and 1967 and thereafter legislatively confirmed on December 17, 1968[6] was a *309 meritorious achievement in furtherance of the public good.
MANDAMUS

Has the Relator Shown a Clear Right to Have Summary Judgment and a Writ of Mandamus?

The fundamental rules governing mandamus have been enunciated many times by our Supreme Court. In Francis v. Corleto, 418 Pa. 417 (1965), it was said, at page 421:
“Mandamus is a high prerogative writ representing an extraordinary remedy which will not be granted in doubtful cases. It will issue only where there is a clear and specific legal right in plaintiff and a corresponding duty in defendant and a want of any other adequate and appropriate remedy. Verratti v. Ridley Twp., 416 Pa. 242, 206 A.2d 13 (1965). In addition, mandamus may be used only to compel performance of a purely ministerial or mandatory duty. Volunteer Firemen’s Relief Ass'n v. Minehart, 415 Pa. 305, 203 A.2d (1964).”
And, at page 429:
“Although granted by the law side of the court, mandamus is essentially equitable in nature, requiring the application of equitable principles. It is reserved only for those situations where necessary to promote the ends of justice and where the prayer of the petitioner appeals to the conscience of the court. Taggart v. Bd. of Dir. of Cannon-McMillan Jt. School Sys., 409 Pa. 33, 185 A.2d 332 (1962); Hotel Casey Co. v. Ross, 343 Pa. 573, 23 A.2d 737 (1942). See Travis v. Teter, 370 Pa. 326, 87 A.2d 177 (1952).”
We conclude that the relator-Attorney General is not entitled to summary judgment or to have this court direct the issuance of a writ of mandamus. The right to these extraordinary remedies is not clear for various reasons:
*310 First: Section 1502 of The Fiscal Code does not authorize the Governor to supersede the Board of Arbitration of Claims in the particular circumstances of this case.
Second: we think the State Treasurer, a high constitutional officer of the Commonwealth, has some inherent, though undefined, measure of discretion in discharging the important duties of her office. At the argument before this court, counsel in response to a question, advised us that the State Treasurer is required to post a “fidelity bond” in the sum of $500,-000; a huge sum, indeed, if the office requires nothing more than clerical services without any discretion or obligation when called upon to pay out vast amounts of the taxpayers’ money.
We think there is merit in the State Treasurer’s contention that:
“Neither the Attorney General nor the Governor can convert into a ministerial function defendant State Treasurer’s function of examining vouchers and either approving or disapproving them, imposed by Section 1502 of The Fiscal Code. That function necessarily requires the exercise of judgment and discretion, and the defendant’s decisions rendered pursuant to that provision can not properly be made subject to mandamus simply because either the Attorney General or the Governor, or both, disagree with them. . .” See Com. ex rel. the Attorney General v. Mathues, supra, 210 Pa. 372, at pages 381, 390.
Third: The present posture of the case.
Unfortunately, the contract, which is the source of this protracted dispute, was not offered in evidence and the court has not seen it. However, the State Treasurer’s letters attached as exhibits to the stipulation of facts indicate she had a copy in her possession. *311 No doubt its omission from the stipulation and supplemental and amended stipulation of facts was due to the zeal of the able counsel on both sides who concentrated their fire on the pivotal questions, viz., whether the State Treasurer had a right to question the validity of the contract, the alleged right of the Governor to “decide the issue” raised between the Department of the Auditor General and the Treasury Department, the finality of the Governor’s decision and the legal method selected thereafter to enforce it.
Although there are various references to the contract in the letters exchanged between the State Treasurer and the Attorney General, the reader cannot obtain a clear understanding of the contract by merely examining these letters. Even with the contract before her, the State Treasurer in her letter to the Attorney General dated May 9, 1968 (exhibit “A”), felt the need for clarification of the basis of Keisling’s annual salary. She wrote:
“Although Paragraph 4 of the agreement provides for a maximum annual payment of $75,000 for services provided under Paragraph 3(a) and (b), no maximum payment is provided for services rendered under Paragraph 3(c), (d), (e) and (f).”
The Attorney General replied on May 23, 1968 (exhibit “B”):
“(3) The sum of $75,000 mentioned in the contract as a maximum payment comprehends all services enumerated under paragraph 3.”
In her letter to Attorney General Sennett dated January 6, 1970, the State Treasurer reiterated her position that no specific statutory authority for the contract existed on the date it was executed, December 1, 1967, and further amplified her objections, viz.
*312 “Section 507(c) of The Administrative Code, which authorizes employment of professional or skilled labor on a temporary basis, but which could not apply to this contract covering an initial period of one year with automatic year-to-year renewals in the absence of 30 days termination notice prior to any anniversary date.
“Act No. 386 of 1968, which was not approved by the Governor until December 17, 1968, more than a year subsequent to the date of the contract.
“Obviously, none of these laws could have authorized the contract entitling Keisling to receive as much as $75,000 per year during each year the contract remains in effect.
“(2) I have also asked you to justify the legality of Paragraph 3(c) which purports to authorize Keisling to write, design and supervise production of pamphlets, publicity and similar materials. On its face, this provision appears to violate the long-standing constitutional requirement that all state printing must be procured through competitive bidding and must be awarded to the lowest responsible bidder”: Stipulation of Facts, exhibit “I”
Fourth: Despite the averment of the counsel general in his brief that “. . . the basic purpose of this suit ... is to enforce the statutory duty of the State Treasurer to follow the advice of the Attorney General,” we think the real party in interest in this case is Keisling Associates, Inc., and that it has an adequate remedy at law and may pursue its claim “in the proper forum and by a proper cause of action”: Boslover Ahavas Achim Belzer Assn. v. Philadelphia Redevelopment Authority, 425 Pa. 535, 539 (1967).
In concluding this opinion, we are mindful of the observation made by Judge von Moschzisker in Com *313 monwealth ex rel. The Attorney General v. Mathues, supra, 210 Pa. 372 (1904), at page 376:
“It should be remembered that the writ of mandamus is in its origin a prerogative writ, and the discretion of the court is large in determining as to when it should be issued.”
In the exercise of our discretion, we are constrained to make the following
ORDER
And now, March 17,1971, for the foregoing reasons, the motion of the relator for summary judgment is denied and the application for a writ of mandamus is dismissed.

 Stipulation of facts, exhibit “B”.

 The Act of April 9, 1929, P. L. 177, sec. 512, 71 PS §192.

 Italics throughout ours unless otherwise noted.

 “The Department of Justice, in November 1969, prepared and submitted to the then Auditor General three voucher transmittals being no. 381 dated August 11, 1969, no. 507 dated August 14,1969, and no. 515 dated August 21, 1969, seeking payment of $42,877.51 to Keisling Associates, Inc., for all services allegedly performed by Keisling during the 15-month period from March 1968 through May 1969, both dates inclusive, under the contract awarded to Keisling by the Department of Justice on December 1, 1967. The $42,877.51 included the $288 which had also been claimed on voucher no. 267 submitted by the Department of Justice to defendant, as Auditor General, in May 1968, described and discussed in paragraphs 3-7 hereinbefore, and represented services allegedly performed during the following periods:

Voucher No. and Date Period Amount

No. 381 — 8/11/69 March, 1968 $ 288.00
April, 1968 6,796.82

*296
Period Amount

May, 1968 982.00
June, 1968 5,000.00
June, 1968 3,685,57
$16,752.39
No. 507 — 8/14/69 July, September
October, 1968 $ 7,687.53
No. 515 — 8/21/69 August, November
& December 1968;
January, February,
March, April &
May, 1969 $18,437.59”

 One of the judges of the Court of Common Pleas of Dauphin County being interested in the question, and the other having been a member of the legislature at the time of the passage of the Act of April 14, 1903, Judges von Moschzisker, of Philadelphia County, and Bell, of Blair County, were called in by the Dauphin County court to hear and decide the case in the court below. Both of these judges were without interest, having been commissioned after the passage of the Act of Assembly in question.

 The Act of December 17, 1968, P. L. — (no. 386), sec. 1, 71 PS §307-1, et seq.